1  SYLVIA SHIH-YAU WU (CA Bar No. 273549)
   MEREDITH STEVENS (CA Bar No. 328712)
2  Center for Food Safety
   303 Sacramento Street, 2nd Floor
3  San Francisco, CA 94111
   Phone: (415) 826-2770
4  Emails: swu@centerforfoodsafety.org
           meredith@centerforfoodsafety.org
5
   *Counsel for Plaintiffs*
6

7

8                    **THE UNITED STATES DISTRICT COURT**
                  **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
9

10
   CENTER FOR FOOD SAFETY,              )  Case No. 3:20-cv-1537
11 SWANTON BERRY FARMS, INC., FULL      )
   BELLY FARM, INC., DURST ORGANIC      )
12 GROWERS, INC., TERRA FIRMA           )  **COMPLAINT FOR**
   FARMS, INC., JACOBS FARM/DEL         )  **DECLARATORY AND**
13 CABO, INC., LONG WIND FARM, INC.,    )  **INJUNCTIVE RELIEF**
   ONECERT, INC., and MAINE ORGANIC     )
14 FARMERS AND GARDENERS                )
   ASSOCIATION,                         )
15                                      )
                                        )
16         *Plaintiffs,*                )
                                        )
17         v.                           )
                                        )
18                                      )
   SONNY PERDUE, in his official capacity as  )
19 Secretary of the United States Department of )
   Agriculture, BRUCE SUMMERS, in his   )
20 official capacity as Administrator of the )
   Agricultural Marketing Service, JENNIFER )
21 TUCKER, Ph.D., in her official capacity as )
   Deputy Administrator of the National )
22 Organic Program, and the UNITED STATES )
   DEPARTMENT OF AGRICULTURE,           )
23                                      )
                                        )
24         *Defendants.*                )
                                        )
25 _____      )

26

27

28

Plaintiffs Center for Food Safety, Swanton Berry Farms, Inc., Full Belly Farm, Inc., Durst Organic Growers, Inc., Terra Firma Farms, Inc., Jacobs Farm/Del Cabo, Inc., Long Wind Farm, Inc., OneCert, Inc., and Maine Organic Farmers and Gardeners Association (collectively, Plaintiffs) on behalf of themselves and their members, allege as follows:

## INTRODUCTION AND NATURE OF ACTION

1.      This is a civil action for declaratory and injunctive relief. Plaintiffs seek declaration that Defendant the United States Department of Agriculture (USDA), under Defendants Secretary Sonny Perdue, Administrator Bruce Summers, and Deputy Administrator Jennifer Tucker, Ph.D. (collectively, USDA or Defendants), violated federal laws, as set forth in the causes of actions below, in denying a legal rulemaking petition requesting USDA to prohibit organic certification of hydroponic operations, which are production systems that grow food and crops without any soil. USDA's denial violates the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*, and the Organic Foods Production Act (OFPA), 7 U.S.C. §§ 6501 *et seq.*, and undermines the very integrity of the National Organic Program and the Organic label that consumers trust and that organic farmers rely upon.

2.      In passing OFPA in 1990, Congress created the National Organic Program to establish uniform national production and handling standards for the farming of foods labeled and sold as organic. In recognition that the sound management of biological diversity and soil fertility is one of the foundational principles of organic farming, Congress specified in OFPA that organic crop production must "foster soil fertility," and mandated that agricultural producers incorporate soil-based management practices as part of organic crop production. USDA's regulations implementing the National Organic Program reflect these standards in requiring crop production practices to foster soil health, biodiversity, and ecological balance. These mandatory, specific soil-based production requirements create an equal marketplace for organic farmers, and ensure that foods labeled and sold as organic are consistently produced to deliver the ecological benefits that consumers associate with the Organic label.

3.      In light of the principles of organic farming and the requirements of OFPA, stakeholders in the organic marketplace have consistently held that as a soil-less crop production

system, hydroponic operations do not foster soil fertility, and cannot meet the requirements for organic certification under the National Organic Program. Accordingly, on January 16, 2019, Plaintiff Center for Food Safety (CFS) filed a legal rulemaking petition (the Petition) with USDA, formally asking USDA to engage in rulemaking to prohibit organic certification of hydroponic operations. Yet, despite the fact that organic producers, handlers, certifiers, retailers, and customers all expect all organic products to adhere to organic farming principles and meet the legal requirements of OFPA, in a letter dated June 6, 2019, USDA denied the Petition (the Petition Denial). The Petition and USDA's Petition Denial are attached as Exhibits A and B of this Complaint, respectively.

4.      USDA's Petition Denial is arbitrary and capricious, in violation of OFPA and the APA. The Petition Denial violates OFPA's legislative intent and its plain language, is contrary to the mandatory statutory and regulatory requirements of OFPA, and creates inconsistent organic standards, in violation of OFPA, that weaken the integrity of the Organic label and degrade the quality of organically labelled foods. USDA's Petition Denial creates an exception for hydroponic operations in the National Organic Program that lacks any basis in OFPA, authorizes ongoing violations of legal organic production requirements, and creates an inconsistent and unequal marketplace for organic farmers, handlers, certifiers, retailers, and consumers.

5.      Accordingly, Plaintiffs seek declaratory relief establishing that the Petition Denial violates OFPA, and that USDA's rationale for denying the Petition and allowing organic certification of hydroponic operations is *ultra vires*, arbitrary and capricious, and contrary to law under the APA. Plaintiffs respectfully request vacatur of USDA's unlawful Petition Denial, and injunctive relief barring Defendants from authorizing organic certification of hydroponic operations under OFPA. Finally, Plaintiffs seek attorneys' fees and costs pursuant to 28 U.S.C. § 2412(d).

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (United States as Defendant); 28 U.S.C. § 2201 (declaratory relief); and 5 U.S.C. §§ 701-706 (APA).

7.      Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(e) because one or more of the Plaintiffs reside in this District.

**PARTIES**

*Plaintiffs*

8.      Plaintiff Center for Food Safety (CFS) brings this action on behalf of itself and its members. Founded in 1997, CFS is a national public interest, nonprofit, membership organization with offices in San Francisco, CA; Portland, OR; and Washington, D.C. CFS represents over 950,000 members in nearly every state in the country who support organic food and farming, including organic food producers, handlers, certifiers, retailers, and consumers. CFS and its members are being, and will continue to be, injured by the Petition Denial and USDA's decision to authorize organic certification of hydroponic operations.

9.      CFS's fundamental mission is to empower people, support farmers, and to protect the environment from the harmful impacts of industrial agriculture, and promote truly sustainable agriculture such as organic farming. One of CFS's flagship programs is its "Organic and Beyond" program, which seeks to protect the integrity of the national organic standard. CFS has multiple full-time policy, scientific, outreach, and legal staff members devoted to this program and its goals. A large part of the program is safeguarding the Organic label and educating the public concerning organic food production methods. CFS also provides public oversight to the organic regulatory program to ensure organic integrity.

10.     To achieve its goals, CFS disseminates to government agencies, members of Congress, and the general public a wide array of educational and informational materials addressing organic standards and food supply issues. These materials include, but are not limited to, reprints of news articles, policy reports, legal briefs, press releases, action alerts, and fact sheets. CFS also sends out action alerts to its True Food Network members. These action alerts generate public involvement, education, and engagement with government officials on issues related to the National Organic Program and other issues affecting the Organic label and the sustainable food system it advances. Collectively, the dissemination of this material has made CFS an information clearinghouse for public involvement and governmental oversight of the

National Organic Program.

11.     In addition to information and public education, one of CFS's core activities is challenging administrative actions and serving as an agency watchdog to protect organic integrity. When necessary, CFS engages in public interest litigation challenging agricultural practices that harm human health and the environment—such as pesticide use and genetically engineered crops, or that impact farmers, consumers, and the public interest. Many of CFS's past lawsuits involved issues relating to organic integrity. For example, CFS was an amicus in *Harvey v. Veneman*, 396 F.3d 28 (1st Cir. 2005), the seminal case challenging USDA's implementation of OFPA. CFS was also counsel and a plaintiff in a successful challenge to USDA's failure to comply with APA notice and comment procedure for a rule that would have allowed compost contaminated with pesticides to be used in organic production. *See Ctr. For Envtl. Health et al. v. Vilsack*, No. 15-CV-01690-JSC, 2016 WL 3383954 (N.D. Cal. June 20, 2016). CFS also brought a challenge to ensure that synthetic substances are not unduly allowed in organic production, and to preserve the congressionally-intended process for removing these substances from organic production. *See Ctr. For Food Safety et al. v. Perdue*, No. 15-cv-1590-HSG (N.D. Cal. May 24, 2018). Finally, CFS is counsel and a plaintiff in *National Organic Coalition et al. v. Perdue*, No. 18-CV-01763-RS (N.D. Cal. filed Mar. 21, 2018), a case challenging USDA's revocation of a final rule setting detailed animal welfare standards for organically-raised livestock and poultry.

12.     USDA's Petition Denial injures CFS and its members. CFS has consistently worked to protect the integrity of organic standards and the Organic label since its inception, including public and member education on the principles of organic production, and active participation in USDA's implementation of the National Organic Program. Specifically, CFS, along with other organic stakeholders, has consistently stated that hydroponic operations fail to satisfy the tenets of organic farming, and do not meet the statutory and regulatory requirements of OFPA. For example, in 2015, in its comments to the National Organic Standards Board (NOSB), a fifteen-member board including representatives from different sectors of the organic marketplace charged by Congress to assist USDA with developing standards for organic

production, CFS emphasized the organic community's view that hydroponic operations do not meet the production requirements for organic certification.[1] CFS drafted and submitted the Petition at issue in this case in response to USDA's continued failure to act on the demands of the organic community and the recommendations of the NOSB to prohibit organic certification of hydroponic operations. USDA's Petition Denial and its decision to continue to allow hydroponic operations in the National Organic Program has injured, and will continue to injure, CFS's organizational efforts to protect the integrity of the Organic label, and to ensure consistent and high standards for organic production.

13.     CFS's members include participants in the organic marketplace, including organic food producers, handlers, certifiers, retailers, and consumers. These members choose organic production methods and foods produced organically because they believe in the ecological and health benefits of organically produced foods. For example, CFS members who are organic farmers invest their time and labor, and often incur higher costs of production, to practice soil management practices such as cover-cropping, mulching, and manure application, in order to build soil fertility, in compliance with the requirements of OFPA and the principles of organic farming. Additionally, CFS members who are organic consumers often pay a price premium for organic products because they believe that organic foods are produced with high and consistently-applied standards, including standards for improving soil and the overall environment. The Petition Denial injures these CFS members by weakening organic integrity and creating inconsistent organic standards.

14.     Plaintiff Swanton Berry Farms, Inc. (Swanton Berry Farm) is a certified organic farm with fields located in Santa Cruz and San Mateo counties in California. Founded in 1983, Swanton Berry Farm began experimenting with organic farming techniques then available, with the goal of producing commercial-grade fruit, and offering it at prices that could economically sustain the farm. The conventional wisdom in the industry at that time was that, while it was possible to grow small quantities of lower-grade berries using organic methods, it was not

---

[1] CFS Comments to the NOSB, Docket No. AMS-NOP-15-0037-0001 (Oct. 8, 2015), *available at* https://www.centerforfoodsafety.org/files/cfs-nosb-comments-10082015_11599.pdf.

possible to grow high-quality berries in large enough quantities and at such prices as to make for a successful organic strawberry farming enterprise.

15. Over the years, Swanton Berry Farm developed various soil-building techniques that, taken together, managed to achieve healthier soils that were resistant to many soil diseases. Moreover, the organic amendments and cover crops added to the overall complexity of the soil biological profile, giving the berries a more appealing flavor as well as a better nutritional value. The higher-quality fruit could justify a higher price, making the farm financially successful.

16. As part of the strawberry soil fertility program, Swanton Berry Farm rotates crops into different fields each year. Strawberries represent only about 1/6 of the total farmed acres. The farm also grows broccoli, cauliflower, Brussels sprouts, artichokes, peas, celery, squashes, green beans, and other berries such as blackberries, olallieberries, and tayberries on the remaining acreage. Strawberries remain the farm's main crop. As an organic farm, Swanton Berry Farm is dedicated to improving the tilth and the biological and nutritional health of the soils it manages. The farm's time-honored method of farming is what its customers understand and expect when they purchase Swanton Berry Farm's certified organic strawberries.

17. The various other crops the farm grows make it possible to offer year-round employment to the farm's employees. The farm has had a contract with the United Farm Workers of America for over twenty years, which requires the farm to provide its employees with good wages, full health and dental coverage at no cost to the employees, plus a pension plan, holidays, paid time off, and vacation pay.

18. Swanton Berry Farm believes that hydroponic operations have their place in a diverse marketplace, but they do not conform to the soil-building requirements of the Organic label that consumers associate with organic farming. Swanton Berry Farm's market competitiveness is injured by the confusion caused by the availability of hydroponically produced strawberries labeled and sold as "Organic" at lower prices than those that soil-based organic strawberry farmers can afford to match. Swanton Berry Farm's vocational, reputational, and financial interests in farming organically are injured by USDA's Petition Denial and its decision to allow the ongoing organic certification of hydroponic crops without due regard for

the principles of organic farming required by OFPA and the National Organic Program.

19.     Plaintiff Full Belly Farm, Inc. (Full Belly Farm) is a diversified 400-acre certified organic farm located in the Capay Valley of Yolo County, California. Full Belly Farm has been certified organic by the California Certified Organic Farmers (CCOF) accreditation service since 1985, even before the passage of OFPA and the creation of the National Organic Program.

20.     As a certified organic farm, Full Belly Farm has been a long-time champion of the principles of organic farming and the integrity of the Organic label. Full Belly Farm chose to farm its land organically because the farm owners firmly believe in the principles of organic farming, which are rooted in the principles of health, ecology, fairness, and care. Fully Belly Farm strives to be good stewards of the farm so that current and future generations may continue to be nourished by the healthy and vibrant foods that the farm produces. The farm is currently co-owned by three families spanning two generations who all work full-time on the farm, and employs about 80 employees. Full Belly Farm also has an apprenticeship program that trains younger generation of food producers and farmers. It is one of the goals of the farm to integrate farm production with longer-term environmental stewardship.

21.     Full Belly Farm achieves its goal of integrating farm production with long-term environmental stewardship through a variety of means, including growing and marketing over 80 different crops, planting habitat areas for beneficial insects and wildlife, and perhaps most importantly, building soil fertility.

22.     Full Belly Farm is committed to building soil fertility, both as a way of providing environmental stewardship of its farmland, and as a necessary part of its farm plan for organic certification. Cover crops, compost, and careful application of organically approved micronutrients provide the principal foundation of soil fertility and nutrient management at Full Belly Farm. Additionally, Full Belly Farm also invests in different methods to build soil through soil amendments, as well as other methods such as minimized tillage for soil preparation, planting leguminous cover crops for nitrogen sequestration in soil, carbon-accumulating plants to enhance soil carbon sequestration, and tractor cultivation for weed control. Over the years, Full Belly Farm has also experimented with different ways of rebuilding and building soil, such as

using a field as a sheep pasture for a few years prior to converting it to a crop field, or taking row crop ground out of production for a few years at a time to rebuild soil fertility. Full Belly Farm also invests in regular nutrient analyses of the organic compost they purchase, as well as regular soil testing, in order to monitor its soil quality, and to build on its soil management practices. These efforts to build and monitor soil fertility cost the farm labor, time and financial investment, but Full Belly Farm adheres to these practices because the farm values its organic certification and its role as a steward of the land. Full Belly Farm believes that a long-term commitment to building soil and caring for the complex environment of the farm is part of the requirements of the National Organic Program and what it means to be an organic farm.

23.     Amongst Full Belly Farm's diversified crop offerings are different types of tomatoes, berries, fresh lettuce and other salad greens, as well as different herbs. Full Belly Farm sells its products through multiple channels, from wholesale and retail, restaurants and farmers markets, and also directly through its Community-Supported Agriculture (CSA) subscriber program where subscribers receive boxes of fresh produce delivered to convenient neighborhood locations. Full Belly products are sold through these various channels within a 120-mile radius from the farm.

24.     In recent years, Full Belly Farm has experienced increased price competition in our wholesale and retail channels with hydroponically produced, certified organic produce. These products are not labeled as hydroponically grown or grow without soil so they are in direct competition with some of the crops that Full Belly produces because they bear the Organic Label. Retailers, wholesalers, and consumers have no way of determining how these tomatoes were grown and assume they are equivalent to the soil-grown tomatoes Full Belly Farm produces. These hydroponic crops are available year-round and as such command a growing share of the market. As a result, Full Belly Farm has experienced a continual downward pressure on price from competition from hydroponic tomatoes, lettuce and berries, often grown with cheaper labor in such operations in Mexico.

25.     Full Belly Farm's credibility as an organic producer is being compromised by USDA's creation of an entirely new type of organic production, without any regard of the

historical role and principal importance of caring for a soil system and feeding the complex ecology of soil in order to build healthy plants that are resistant to diseases, more nutrient-dense, and that are healthier. As a long-time champion and practitioner of organic farming with a firm belief in building soil as the foundation of organic farming, Full Belly Farm's vocational, reputational, and economic interests as a certified organic farm have been, and will continue to be, injured by USDA's Petition Denial and its decision to allow the ongoing organic certification of hydroponic operations without due regard for the principles of organic farming required by law.

26.     Plaintiff Durst Organic Growers, Inc. (Durst Organic Growers) is a certified organic, family-owned farm located in Yolo County, California. While the Durst family has farmed the land since the late 1800's, beginning with the farming of grain and livestock, the current fourth-generation owners have focused on providing consumers with fresh, organic market produce. Durst Organic Growers has been certified organic by CCOF continuously since 1988, even before the passage of OFPA and creation of the National Organic Program, beginning with a small acreage of the farm and eventually transitioning all farm acres into organic production.

27.     Durst Organic Growers has always been a steward of the principles of organic farming. For example, current owner Jim Durst worked with other farmers and CCOF staff in the 1980s to develop the original soil-based organic standards that later became the basis for the National Organic Program.

28.     As an organic farm, Durst Organic Growers has been, and continues to be, committed to utilizing soil management practices to maintain or increase the availability of nutrients for plants in its soil and to manage pests. These methods include cover cropping, crop rotation, and minimum tillage to reduce soil compaction and erosion. Durst Organic Growers believes that maintaining a healthy soil biome is the basis of organic farming and soil stewardship. Durst Organic Growers also believes that building soil fertility and adherence to organic farming practices enables it to grow nutrient-dense and flavor-filled vegetables and crops for its customers.

29.     Durst Organic Growers currently farms roughly 800 organic acres of a variety of crops, including tomatoes, asparagus, snap peas, winter squash, watermelons, alfalfa, and small grains for retail and wholesale markets both locally and across the country. Cherry tomatoes are one of Durst Organic Growers' largest income crops. Having grown organic cherry tomatoes for more than 30 years, consumers have come to recognize Durst Organic Growers' tomatoes for their flavor and quality. In recent years, Durst Organic Growers has experienced some loss in its market share due to competition from hydroponic operations that produce tomatoes year-round in a controlled atmosphere environment without any soil.

30.     Durst Organic Growers has an unwavering commitment to organic practices and the rule of law embodied in OFPA, as evidenced by its early adoption of organic principles and embracing of organic certification even before OFPA came into being. As a long-standing organic farm, Durst Organic Growers' interests in farming organically and offering organic produce to organic consumers has been, and will continue to be, injured by USDA's Petition Denial and its decision to allow the ongoing organic certification of hydroponic operations without due regard for the soil fertility requirements of OFPA.

31.     Plaintiff Terra Firma Farms, Inc. (Terra Firma Farm) is a 200-acre, certified organic farm located in Winters, California. Terra Firma Farm has been providing consumers with healthful fruit and vegetables year-round for over 25 years, and has been certified organic by CCOF since 1988, even before the creation of OFPA and the National Organic Program. Terra Firma Farm (then operating under the name Sky High Farm) was one of the original members of CCOF, and thus was instrumental in setting the standards of organic farming in California, many of which were subsequently adopted into the National Organic Program.

32.     Terra Firma Farm is blessed by its location, which provides it with high annual rainfall, rich soils, mild weather, and a year-round creek. Terra Firma Farm's individual farm sites provide microclimates and different soil types that allow the farm to produce around 100 different kinds of high-quality fruit and vegetables each year. Today, Terra Firma Farm's crops feed about 800 households in the San Francisco Bay Area, Davis, Sacramento, and in Terra Firma Farm's hometown of Winters through its CSA subscriber program. Terra Firma Farm's

produce and fruits are also sold at wholesale to retail grocers in the San Francisco Bay Area, Davis, and Sacramento, and to restaurants and other vendors in the same geographic locations.

33.     As an organic farm, Terra Firma Farm has always been committed to practicing ecologically sustainable agriculture that protects and builds the soil, provides habitat for wildlife, and conserves energy and water. In particular, in accordance with the principles of organic farming as well as the requirements of the farm's organic certification, Terra Firma Farm utilizes different soil management practices to maintain its soil ecology and increase the micronutrients in its soil. For example, Terra Firma Farm regularly practices compost application, cover cropping, and crop rotation as ways of protecting its soil, reducing erosion and runoff, retaining soil moisture content, and building up nitrogen and carbon in the soil. These practices cost the farm labor, time, and money, but Terra Firma Farm is committed to them because these practices have enabled the farm to produce healthier and more flavorful fruits and vegetables.

34.     Because of Terra Firma Farm's geographic location and its organic farming practices, Terra Firma Farm has been able to produce and sell early-season tomatoes at a time when other farms in the area are not yet able to market them. Early-season tomatoes provide an important income stream for Terra Firma Farm. Consumers choose to buy early-season tomatoes produced by Terra Firma Farm because they know that the tomatoes are always packed with the sweetness, acidity, and flavors that they are looking for when buying tomatoes.

35.     Terra Firma Farm has lost sales opportunities and suffered financial losses as a result of competition from certified organic tomatoes produced by hydroponic operations. As controlled, soil-less growing operations, hydroponic producers are able to provide tomatoes year-round, thus removing Terra Firma Farm's advantage of being able to provide and sell early-season tomatoes in the marketplace. Additionally, Terra Firma Farm believes that its soil-grown, early-season tomatoes provide more flavor than those that are grown hydroponically, but because consumers do not have a way of distinguishing between hydroponically produced organic tomatoes and Terra Firma Farm tomatoes sold in stores, they may instead conclude that all early-season tomatoes have less flavor and stop purchasing them. Thus, as a result of market competition from hydroponically produced tomatoes, Terra Firma Farm has suffered financial

losses due to lowered wholesale and consumer demand for early-season tomatoes.

36.     As a long-standing organic farm, Terra Firma Farm's vocational, reputational, and economic interests have been, and will continue to be, injured by USDA's Petition Denial and its decision to allow the ongoing organic certification of hydroponic operations without due regard for OFPA's statutory mandates and its soil-centered requirements.

37.     Headquartered in Pescadero, California, Plaintiff Jacobs Farm/Del Cabo, Inc. (Jacobs Farm) is one the nation's leading certified organic growers of fresh culinary herbs, edible flowers, as well as a variety of produce including tomatoes and squash. Husband and wife co-founders Larry Jacobs and Sandra Belin started the farm in 1980. From the beginning, Jacobs Farm was committed to growing high quality and flavorful crops by building healthy soils and creating diversified crop-scapes without toxic chemicals. In 1986, Jacobs Farm launched the Del Cabo Cooperative, a collaboration between Jacobs Farm and small-scale farmers in rural Baja California, with the goal of creating economic opportunities for these farmers through community-owned organic production. Today, Jacobs Farm consists of a collection of organic farms along the coasts of California and Mexico, spanning across nearly 5,000 acres of certified organic fields and greenhouses, all dedicated to growing high quality foods produced in accordance with sound organic practices and the understanding that healthy soils produce healthy plants and healthy people.

38.     As one of the nation's first certified organic farms, Jacobs Farm is committed to the principles of organic farming. From the beginning, Jacobs Farm has strived to build healthy soils. Core to that stewardship of farmland has been building soil health and soil fertility by planting cover crops, rotating crops, and crop diversification, as well as the regular addition of compost and soil amendments. Jacobs Farm regularly measures organic matter and nutrient levels in its soil. Although these practices cost Jacobs Farm time, labor, and money, Jacobs Farm adheres to these practices because the farm believes that they are integral to the meaning of an organic farm, and that these practices enable the farm to produce high quality, flavorful crops for their customers. The individual family farms within Jacobs Farm's Del Cabo Cooperative are also committed to these same organic farming practices.

39.     While crops grown hydroponically have numerous ecological benefits, Jacobs Farm believes that hydroponic operations do not conform to the soil-building requirements and soil-centric focus of the Organic label. As a long-standing organic farm dedicated to maintaining the meaning of organic farming and the integrity of the Organic label, Jacobs Farm's vocational, reputational, and economic interests as a certified organic farm have been, and will continue to be, injured by USDA's Petition Denial and its decision to allow the ongoing organic certification of hydroponic operations without due regard for the requirements of OFPA.

40.     Plaintiff Long Wind Farm, Inc. (Long Wind Farm) is a certified organic farm located in East Thetford, Vermont. Founded by current owner Dave Chapman in 1984, Long Wind Farm was first certified organic by Vermont Organic Farmers, before receiving organic certification under the National Organic Program in 2002. Long Wind Farm specializes in producing delicious organic tomatoes for customers throughout the Northeast region of the United States. Today Long Wind Farm farms employs about 30 employees to farm roughly 2.5 acres of organic tomatoes in greenhouses.

41.     Long Wind Farm's tomatoes are sold in stores throughout the Northeast, as well as at a farm stand on the farm. In recent years, Long Wind Farm has lost some store contracts as a result of price competition from hydroponically produced, certified organic tomatoes.

42.     As an organic farm, Long Wind Farm is committed to farming in accordance with the principles of organic farming. One such key component of Long Wind Farm's farming method is building soil fertility. Long Wind Farm firmly believes that better soil produces tastier and better tomatoes. Long Wind Farm utilizes various soil management methods such as on-farm produced compost, the additions of organic plant meals, and no-till production, in order to build soil fertility and grow better tomatoes.

43.     As an organic tomato producer focused on building soil fertility and growing delicious tomatoes from the soil, Long Wind Farm's vocational, reputational, and financial interests have been, and will continue to be, injured by USDA's Petition Denial and its decision to allow the ongoing organic certification of hydroponic operations without due regard for the principles of organic farming required by law.

44.   Plaintiff OneCert, Inc. (OneCert) is a USDA accredited organic certifying agent headquartered in Lincoln, Nebraska. OneCert was accredited as a certifying agent of the National Organic Program on April 22, 2003 for organic crops, wild crops, livestock, and handling operations. OneCert currently certifies operations across the nation in accordance with the National Organic Program standards, including California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Minnesota, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. OneCert also certifies operations internationally.

45.   As an accredited certifying agent, it is the responsibility and duty of OneCert to ensure that organic operations, including organic crop production farms, operate in accordance with the requirements of the National Organic Program, including the Program's plain requirement that organic crop production improve soil fertility. As part of its certification process, OneCert asks potential applicants to comply with Section 6513(b)(1) of OFPA, which mandates that organic crop production foster soil fertility "primarily through the management of the organic content of the soil through proper tillage, crop rotation, and manuring." 7 U.S.C. § 6513(b)(1). Hydroponic operations cannot meet that requirement, and as a result, OneCert has lost interested applicants who choose to be certified by another certifying agent who does not require compliance with that provision of OFPA.

46.   OneCert's business interests have been, and will continue to be, injured by USDA's Petition Denial and its decision to allow the ongoing organic certification of hydroponic operations.

47.   Plaintiff Maine Organic Farmers and Gardeners Association (MOFGA) is a nonprofit organization based in Unity, ME, with nearly 11,000 dues-paying members. MOFGA's membership includes certified organic farmers, organic gardeners, organic consumers, producers, retailers and certifiers. MOFGA's members are primarily residents of Maine, but it has members in nearly every state in the U.S. as well.

48.   MOFGA works to help farmers and gardeners grow organic food, fiber, and other

crops; protect the environment; recycle natural resources; increase local food production; support rural communities; and illuminate for consumers the connection between healthful foods and environmentally sound farming practices.

49.    To achieve its goals, MOFGA trains organic farmers in production methods and certification requirements, provides educational materials to organic consumers to help guide their purchasing decisions, and advises others regarding the positive role organic food production and consumption can play in creating a healthful food supply. As such, MOFGA recognizes the importance of building soil fertility as a core requirement of organic crop production, and educates its members on ways they may incorporate soil-building methods in their organic crop production.

50.    Many of MOFGA's members are certified organic farmers who invest their time and money into building soil on their organic farmers, but who have had to sell their products in similar market channels as those where hydroponically produced, certified organic products are sold. MOFGA's members also include organic consumers who choose the Organic label because they believe the label represents production methods that offer more ecological benefits, including benefits to the soil and the overall agricultural landscape.

51.    USDA's unwillingness to act in accordance with mandates of OFPA and its statutory and regulatory requirements in denying the Petition, and its decision to continue to allow organic certification of hydroponic operations, injure MOFGA members' vocational, economic, and consumer interests by weakening organic integrity, and creating inconsistent organic production standards.

***Defendants***

52.    Defendant Sonny Perdue is sued in his official capacity as USDA Secretary. As Secretary, Mr. Perdue has the ultimate responsibility for USDA's activities and policies, including its implementation of OFPA.

53.    Defendant Bruce Summers is sued in his official capacity as Administrator of the Agricultural Marketing Service (AMS), an agency of USDA. The AMS administers programs at USDA related to the marketing of food and agricultural products. As Administrator, Mr.

Summers has ultimate responsibility for AMS's activities and policies, including the implementation of the National Organic Program and ensuring the Program's compliance with all OFPA and APA regulations.

54.     Defendant Jennifer Tucker, Ph.D., is sued in her official capacity as the Deputy Administrator of the National Organic Program. As Deputy Administrator, she is legally responsible for overseeing National Organic Program activities and ensuring the Program's compliance with all OFPA and APA regulations.

55.     Defendant USDA is the U.S. department that houses the National Organic Program.

## LEGAL AUTHORITY

## I.     ORGANIC FOODS PRODUCTION ACT (OFPA)

56.     With the passage of OFPA, Congress created a national organic production framework that aims to achieve three general purposes: 1) establish national standards governing the marketing of certain agricultural products as organically produced products, 2) assure consumers that organically produced products meet consistent standards, and 3) facilitate interstate commerce in fresh and processed food that is organically produced. 7 U.S.C. § 6501.

57.     To achieve these purposes, OFPA requires the Secretary to establish a national organic certification program (the National Organic Program) for producers and handlers of organic agricultural products. *Id.* § 6503(a); *see* 7 C.F.R. Part 205 (National Organic Program regulations). An agricultural product can be certified under the National Organic Program only if it had been produced and handled "using organic methods as provided for in [OFPA]." 7 U.S.C. § 6503(a).

58.     OFPA also requires USDA to implement the National Organic Program through certifying agents, and promulgate regulations to carry out OFPA's standards and directives. *Id.* § 6503.

59.     An agricultural product can only be sold or labeled as organically produced if it has been produced by a certified organic farm, handled by certified organic handling operations,

and be produced in accordance with the standards of the National Organic Program. *Id.* § 6506(1).

60.     OFPA establishes three baseline standards that an agricultural product must satisfy to be sold or labeled as organic. *Id.* § 6504. First, other than limited exceptions provided under OFPA, organic products must be produced and handled "without the use of synthetic chemicals" *Id.* § 6504(1). Second, organic agricultural products cannot be grown on land where synthetic chemicals have been applied in the previous three years. *Id.* § 6504(2). Third, organic products must be produced in compliance with an organic production plan. *Id.* § 6504 (3).

61.     In enacting OFPA, Congress viewed an organic plan as "a key element in organic production" in order to ensure that products are properly produced. 1990 U.S.C.C.A.N. 4656, 4946.

62.     Accordingly, OFPA requires each organic producer to develop and follow an "organic plan" for organic agricultural production. 7 U.S.C. § 6506(2); *id.* § 6513(a). OFPA defines "organic plan" as "a plan of management of an organic farming or handling operation that has been agreed to by the producer or handler and the certifying agent and that includes written plans concerning all aspects of agricultural production or handling described in this chapter including crop rotation and other practices as required . . . ." *Id.* § 6502(13).

63.     OFPA prescribes components that organic plans must address. *See* 7 U.S.C. § 6513. OFPA prescribes components of organic plans for three types of organic production: crop production, *id.* § 6513(b); livestock production, *id.* § 6513(c); and mixed crop and livestock production, *id.* § 6513(d). OFPA also lists provisions for organic handling plan as well as plan for management of wild crops. *Id.* § 6513(e)-(f).

64.     Organic production methods are critical elements of organic plans under OFPA. Specific to crop production and planting practices, OFPA states that "[f]or a farm to be certified under this chapter, producers on such farm shall not apply materials to, or engage in practices on, seeds, or seedlings that are contrary to, or inconsistent with, the applicable organic certification program." *Id.* § 6508(a). Thus, organic certification requires both organic-certified materials as well as organic-certified production practices.

65.     Recognizing the importance of the input of organic stakeholders in the National Organic Program, OFPA created the NOSB, a fifteen-member board composed of organic farmers, handlers, retailers, certifiers, as well as environmental experts and scientists, and representatives of public interest or consumer interest groups. *Id.* § 6518(b). OFPA tasked the NOSB "to assist in the development of standards for substances to be used in organic production and to advise [the USDA] on any other aspects of the implementation of [OFPA]." *Id.* § 6518(a).

66.     Specific duties of the NOSB include providing recommendations to USDA on the implementation of OFPA, as well as evaluating the appropriateness of natural and synthetic substances for use in organic farming. *Id.* § 6518(k). When evaluating whether a natural or synthetic substance otherwise prohibited in organic farming may nonetheless be included in the National Organic Program, the NOSB must consider, among other factors, a substance's "compatibility with a system of sustainable agriculture" and "the effects of the substance on biological and chemical interactions in the agroecosystem, including the physiological effects of the substance on soil organisms . . . , crops and livestock." *Id.* § 6518(m). This NOSB responsibility goes hand in hand with the NOSB's duty to provide recommendations to USDA regarding implementation of OFPA as whole. *Id.* § 6518(k)(1).

67.     Under OFPA, USDA must consult with the NOSB in developing standards for the Program. *Id.* § 6503.

OFPA's Soil Requirements

68.     The centrality of soil quality to organic production has been critical to OFPA from its very inception. The authors of OFPA made clear that soil, and the maintenance of soil fertility, are essential components of organic production. In the Senate Report on Food, Agriculture, Conservation, and Trade Act of 1990, Congress wrote "a crop production farm plan must detail the procedures that the farmer will follow in order to foster soil fertility, provide for crop rotations, and prohibit certain manuring practices in appropriate to the crop being raised and the land in use." S. Rept. No. 101-357, at 292 (1990).

69.     Accordingly, OFPA's requirements for organic plans of crop production farms specify that "an organic plan shall contain provisions designed to foster soil fertility, primarily

through the management of organic content of the soil through proper tillage, crop rotation, and manuring." 7 U.S.C. § 6513(b)(1). An organic plan for crop production must also prescribe ways to regulate the application of manure to crops. *Id.* § 6513(b)(2).

70.     OFPA's soil-centered organic production requirements are mandatory. The statute establishes that no product shall be labeled or sold as organic unless it meets certain standards, including that it was "produced and handled in compliance with an organic plan." *Id.* § 6504(3). Organic plans "shall not include any production or handling practices that are inconsistent with" OFPA. *Id.* § 6513(g).

71.     USDA's regulations implementing OFPA reflect the same strict adherence to a soil-centered production methodology that fosters biodiversity and ecological balance. Organic production is defined by OFPA's implementing regulations as: "A production system that is managed in accordance with the Act and regulations in this part to respond to site-specific conditions by integrating cultural, biological, and mechanical practices that foster cycling of resources, promote ecological balance, and conserve biodiversity." 7 C.F.R. § 205.2.

72.     The regulations detail mandatory soil-based requirements that organic producers must fulfill in order to obtain and maintain organic certification. First, "the producer must select and implement tillage and cultivation practices that maintain or improve the physical, chemical, and biological condition of soil and minimize soil erosion." *Id.* § 205.203(a). Second, "the producer must manage crop nutrients and soil fertility through rotations, cover crops, and the application of plant and animal materials." *Id.* § 205.203(b). Third, "the producer must manage plant and animal materials to maintain or improve soil organic matter content in a manner that does not contribute to contamination of crops, soil, or water by plant nutrients, pathogenic organisms, heavy metals, or residues of prohibited substances." *Id.* § 205.203(c). OFPA's implementing regulations contain no exceptions for soil-less production systems.

73.     Additional implementing regulations establish mandatory requirements that production practices "maintain or improve the natural resources of the operation, including soil and water quality," 7 C.F.R. § 205.2, and "manage plant and animal materials to maintain or improve soil organic matter content." *Id.* § 205.203.

74.     OFPA regulations also mandate that organic producers engage in crop rotation to "maintain or improve soil organic matter content," "provide for pest management in annual and perennial crops," "manage deficient or excess plant nutrients," or "provide erosion control." *Id.* § 205.205.

75.     Organic production systems must also "respond to site-specific conditions by integrating cultural, biological, and mechanical practices that foster cycling of resources, promote ecological balance, and conserve biodiversity." *Id.* § 205.2.

76.     OFPA regulations also consistently suggest soil samples as a measure for testing compliance with OFPA regulations and the operation's organic plan. *Id.* § 205.670. Certifying agents "must conduct periodic residue testing of agricultural products," with soil samples suggested as a method for testing. *Id.*

77.     "Hydroponic" or similar terms do not appear in OFPA's statutory nor its implementing regulations.

## II.   ADMINISTRATIVE PROCEDURE ACT (APA)

78.     Section 4(e) of the APA, 5 U.S.C. § 553(e), provides that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule."

79.     Section 2(2) of the APA, *id.* § 551(2), defines "person" as "an individual, partnership, corporation, association, or public or private organization other than an agency."

80.     The APA requires that reviewing courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(A). Reviewing courts shall also "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* Section 10(e)(1) of the Act authorizes the reviewing court to "compel agency action unlawfully withheld." *Id.* § 706(1).

1

## FACTUAL BACKGROUND

2

**I.   THE INCOMPATIBILITY OF HYDROPONIC OPERATIONS WITH ORGANIC STANDARDS.**

3

4       81.     Hydroponic operations, commonly referred to simply as "hydroponics," are

5   agricultural operations that grow terrestrial plants and crops without soil, typically in sterile

6   environment such as indoor warehouses. Although these plants and crops naturally require soil

7   microorganisms, nutrients, and minerals in soil for their growth, in hydroponic operations, these

8   plants have their roots in air, water, or some other inert medium, and obtain their nutrients from

9   being immersed in, or periodically being applied with, a nutrient solution created by the

10   hydroponic operators.[2]

11       82.     The NOSB has long held that hydroponic operations do not meet organic

12   standards of production. In 2010, the NOSB integrated previous NOSB subcommittee

13   discussions conducted in 2003, 2008, and 2009 on the subject of hydroponic operations into one

14   formal recommendation (the NOSB 2010 Recommendation).[3] The NOSB 2010

15   Recommendation determined that hydroponic operations cannot meet the requirements of OFPA

16   "due to their exclusion of the soil-plant ecology intrinsic to organic farming systems and

17   USDA/NOP regulations governing them." NOSB 2010 Recommendation at 3.

18       83.     The NOSB 2010 Recommendation explained that "organic farming method

19   derives its name from the practice of maintaining or improving the organic matter (carbon

20   containing) content of farm soil through various methods and practices." *Id.* at 13. Stressing the

21   improvement of soil as "the central theme and foundation of organic farming" under OFPA and

22   pointing to the mandatory soil-centered requirements of organic plans, *id.* at 13-14, the NOSB

23   concluded that "systems of crop production that eliminate soil from the system, such as

24

25   [2] *See* Alternative Farming Systems Info. Ctr., USDA, *Hydroponics*,
    https://www.nal.usda.gov/afsic/hydroponics (last visited Feb 1, 2020).

26

27   [3] NOSB, *Formal Recommendation by NOSB for Rulemaking for Production Standards for Terrestrial Plants in Containers and Enclosures* (Apr. 29, 2010),
    https://www.ams.usda.gov/sites/default/files/media/NOP%20Final%20Rec%20Production%20Standards%20for%20Terrestrial%20Plants.pdf.

28

hydroponics or aeroponics, cannot be considered as examples of acceptable organic farming practices." *Id.*

84.     To implement its formal recommendation, NOSB recommended a rulemaking from USDA defining hydroponics and prohibiting organic certification of hydroponic operations under OFPA. *See* NOSB 2010 Recommendation at 15-19. More than nine years have passed since the NOSB 2010 recommendation.

## II.     USDA'S HYDROPONIC AND AQUAPONIC TASK FORCE AGREED HYDROPONIC OPERATIONS DO NOT COMPLY WITH OFPA.

85.     Despite NOSB's unequivocal recommendation that hydroponic operations do not satisfy the principles of organic farming and the statutory and regulatory requirements of OFPA, rather than implementing the NOSB 2010 Recommendation, USDA instead created the Hydroponic and Aquaponic Task Force (the Task Force) in 2015 to further study the issue. The Task Force was charged with preparing a report to inform the NOSB about hydroponic operations and their alignment with the National Organic Program.

86.     The Task Force's final product, a July 2016 report (the Task Force Report)[4] was comprised of three separate subcommittee reports and those subcommittees' recommendations. The first subcommittee report, the "2010 NOSB Recommendation Subcommittee Report," agreed with the 2010 NOSB Recommendation that hydroponic operations do not meet the soil-centered requirements of OFPA, and thus should be prohibited under the National Organic Program. The second subcommittee report, the "Hydroponic and Aquaponic Subcommittee Report," also agreed with the NOSB 2010 Recommendation that hydroponic operations cannot qualify for organic certification, but carved out an exception for organic certification in limited situations, referred to as bioponics in the Task Force Report, in which hydroponic operations utilize "plants in growing media" such that the plants "derive nutrients from natural . . . substances that are released by the biological activity of microorganisms." The third

---

[4] Agric. Marketing Serv., USDA, NOSB Hydroponic and Aquaponic Task Force Report (July 21, 2016), *available at*
https://www.ams.usda.gov/sites/default/files/media/2016%20Hydroponic%20Task%20Force%20Report.PDF.

subcommittee report, the "Alternative Labeling Subcommittee Report," focused on exploring alternative labels for hydroponics. None of the subcommittee reports in the Task Force Report recommended that all types of hydroponic operations can be considered for organic certification. The Task Force Report also assumed that hydroponics must still comply with all mandatory organic regulations.

87.     In the memorandum from Miles McEvoy, then Deputy Administrator of USDA's National Organic Program, transmitting the Task Force Report to the NOSB, USDA requested the NOSB to "use this report to make a recommendation to [the USDA]."[5] The USDA stated that it would "take the necessary steps to establish clear standards for [hydroponic and aquaponic] production systems" based on the NOSB's recommendations. *Id.*

### III.   NOSB CONTINUED TO CALL FOR PROHIBITION OF ORGANIC CERTIFICATION OF HYDROPONICS.

88.     Following the July 2016 Task Force Report, the NOSB failed to pass a proposal that would allow organic certification of bioponics at the NOSB's Fall 2016 meeting.[6] Rather, NOSB affirmed its 2010 NOSB Recommendation by passing a resolution.[7] The resolution recognized that "the foundation of organic agriculture is based upon a systems approach to producing food in the natural environment, which respects the complex dynamic interaction between soil, water, air, sunlight, plants and animals needed to produce a thriving agro-ecosystem," and proposed prohibition of organic certification of "hydroponic systems that have

---

[5] Memorandum from Miles McEvoy, Deputy Administrator of National Organic Program to NOSB re: Hydroponic and Aquaponic Task Force Report (July 21, 2016), *supra* note 4.

[6] NOSB, *NOSB Crops Subcommittee Proposal: Aeroponics/Hydroponics/Aquaponics* (Sept. 6, 2016), *available at* https://www.ams.usda.gov/sites/default/files/media/CSHydroponicsBioponicsProposalNov2016.pdf; NOSB, *NOSB Meeting Update* (Nov. 2016), *available at* https://www.ams.usda.gov/sites/default/files/media/NOSBMeetingSummaryFall2016.pdf

[7] NOSB, *NOSB Crops Subcommittee Proposal: Aeroponics/Hydroponics/Aquaponics* (Sept. 6, 2016), *supra* note 6; NOSB, *National Organic Standards Board Meeting Update* (Nov. 2016), *supra* note 6.

1    an entirely water based substrate."[8]

2    89.    The NOSB subsequently released another document, dated February 15, 2017,

3    again calling for prohibition of organic certification of hydroponics and bioponics, titled *Crops*

4    *Subcommittee Discussion Document Aeroponics/Hydroponics/Aquaponics*.[9] The NOSB again

5    recommended prohibition of aeroponics, hydroponics, and aquaponics under OFPA's regulatory

6    section dealing with allowed substances, methods, and ingredients, 7 C.F.R. § 205.105. *Id.*

7    **IV.    USDA CONTINUED TO VIOLATE OFPA.**

8    90.    USDA failed to respond to the NOSB's recommendations; instead, it issued a

9    blanket statement contradictory to both the Task Force Report and NOSB recommendations,

10   stating that "[c]ertification of hydroponic, aquaponic, and aeroponic operations is allowed under

11   USDA organic regulations, and has been since the National Organic Program began. For these

12   products to be labeled as organic, the operation must be certified by a USDA-accredited

13   certifying agent, and maintain compliance with USDA organic regulations."[10] USDA offered no

14   supporting rationale for its statement. USDA made the statement in a website announcement,

15   without any opportunity for public input and without taking any rulemaking action.

16   91.    On information and belief, due to the blanket assertion from USDA without any

17   further clarification, organic certifiers have been inconsistently granting organic certification for

18   hydroponic operations.

19   92.    On information and belief, some organic certifiers within the National Organic

20   Program do certify hydroponic operations in light of USDA's pronouncement. However, many

21   other certifiers disagree that hydroponic operations can comply with the soil-centered

22   requirements of the National Organic Program, and do not certify hydroponics.

23

24   _____

25   [8] NOSB, *NOSB Resolution on Hydroponics* (Nov. 18, 2016), *available at*
     https://www.ams.usda.gov/sites/default/files/media/CSHydroponicsResolution.pdf

26   [9] NOSB, *NOSB Crops Subcommittee Proposal: Aeroponics/Hydroponics/Aquaponics* (Feb. 15,
27   2017), *available at* https://www.ams.usda.gov/sites/default/files/media/CSHydroponics.pdf.

28   [10] Agric. Marketing Serv., USDA, *National Organic Program Organic Insider* (Jan. 25, 2018),
     https://content.govdelivery.com/accounts/USDAAMS/bulletins/1cde3b0.

93.     On information and belief, in the absence of clarifying regulations, as of January 2019, at least 41 operations certify hydroponic operations as organic. Of these, at least 25 are entirely water-based with plant roots submerged in fertilized water, nutrient solution, or aquaponic effluent. *See* Petition (Ex. A) at 20 n. 99-100.These certifications have resulted in ongoing inconsistencies in organic production methods and violations of OFPA and its implementing regulations.

## V.   CENTER FOR FOOD SAFETY'S PETITION.

94.     On January 16, 2019, CFS submitted the Petition to USDA requesting that USDA issue regulations prohibiting certification of hydroponic agricultural production, based on the NOSB's prior recommendations. Petition at 4. The Petition further requested that the USDA amend its regulation on "Allowed and prohibited substances, methods, and ingredients in organic production and handling" to specifically prohibit hydroponic operations. *Id.* at 4. The Petition also sought revocation of any existing organic certifications previously issued to hydroponic operations, and requested that USDA ensure that ecologically-integrated organic production practices are maintained as a requirement for organic certification, as defined by OFPA and its regulations. *Id.* at 5. The Petition was endorsed by thirteen other organic stakeholders, including organic farmers, retailers, certifiers, and public interest and consumer interest groups. *Id.* at 22-23.

95.     The Petition explained that organic certification of hydroponic operations is not permissible for several reasons. First, hydroponic operations cannot be certified organic because they do not accomplish OFPA's statutory mandate to foster soil fertility and improve the organic matter content of the soil. *Id.* at 11-12. Second, hydroponic operations violate OFPA's mandatory requirement of consistency in organic production because hydroponic operations fail to adhere to OFPA's soil fertility requirements. *Id.* at 20. Third, hydroponic operations violate OFPA's implementing regulations requiring improvement of soil quality, management of soil fertility, use of crop rotation practices, conservation of biodiversity, use of other soil management practices, and use of soil samples to measure compliance with OFPA. *Id.* at 12-13.

96. The Petition highlighted the historical importance of soil in organic production and emphasized the mandatory, express language in OFPA and its implementing regulations that plainly require organic production practices to foster soil fertility through management of the soil. *Id.* at 5, 7, 9-10. The Petition sought to compel USDA to act in accordance with the agency's statutory mandate and implementing regulations under OFPA.

## VI. USDA'S PETITION DENIAL.

97. On June 6, 2019, the Deputy Administrator of the National Organic Program denied the Petition. *See* Petition Denial (Ex. B). In the Petition Denial, USDA stated that hydroponic operations may be certified organic "if done in compliance with OFPA and the USDA organic regulations." *Id.* at 1. USDA also denied the Petition's requests to issue regulations excluding certification of hydroponic agricultural production, prohibit hydroponic operations in organic production, and to revoke existing certifications for hydroponic operations. *Id.* at 2-3.

98. Regarding OFPA's statutory and regulatory requirements on fostering soil fertility, the Petition Denial stated that those requirements only apply to production systems that do use soil. *Id.* at 3.

99. USDA failed to explain in the Petition Denial how hydroponic operations can meet OFPA's mandatory statutory and regulatory terms that requiring producers to "select and implement tillage and cultivation practices that maintain or improve the physical, chemical, and biological condition of soil and minimize soil erosion;" "manage crop nutrients and soil fertility through rotations, cover crops, and the application of plant and animal materials;" and "manage plant and animal materials to maintain or improve soil organic matter content in a manner that does not contribute to contamination of crops, soil, or water by plant nutrients, pathogenic organisms, heavy metals, or residues of prohibited substances." 7 C.F.R. § 205.203; *see* 7 U.S.C. § 6513(b).

100. USDA insisted in the Petition Denial that hydroponic operations can meet OFPA's ecological mandates of "cycle resources," "promote ecological balance," and "conserve biodiversity." Petition Denial at 3. USDA entirely fails to address how hydroponic operations

meet these mandates, nor how such potential benefits of hydroponic operations meet the USDA's statutory mandate that organic crop production practices must "foster soil fertility . . . primarily through the management of the organic content of the soil." 7 U.S.C. § 6513 (b).

### FIRST CAUSE OF ACTION

### VIOLATION OF OFPA AND THE APA: PETITION DENIAL BASED ON EXCEPTION FOR SOIL-LESS SYSTEMS IS *ULTRA VIRES* AND CONTRARY TO LAW

101.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 100 of this Complaint as if fully set forth herein.

102.    As described above, in the Petition Denial, USDA stated that OFPA's statutory and regulatory provisions concerning soil and soil fertility only apply to production systems that use soil.

103.    Nothing in OFPA supports USDA's exception to OPFA's statutory and regulatory soil and soil fertility requirements for soil-less hydroponic operations. OPFA does not mention hydroponics nor make any distinction between soil and soil-less crop production methods. Rather, OFPA unequivocally requires that organic crop production must "foster soil fertility, primarily through the management of the organic content of the soil through proper tillage, crop rotation, and manuring." 7 U.S.C. § 6513 (b). OFPA prohibits USDA from approving production methods that are inconsistent with such requirements. *Id.* §§ 6512, 6513(g).

104.    Hydroponic operations do not "foster soil fertility" because hydroponic operations are soil-less, and thus do not rely on, nor foster, soil fertility. Hydroponic operators cannot use "proper tillage, crop rotation, and manuring" in hydroponic production at all, let alone "primarily" use these practices to foster soil fertility. Because hydroponic operations cannot satisfy the requirement of fostering soil fertility mandated for organic crop production, USDA's exception for hydroponic operations is *ultra vires* and invalid.

105.    An agency's power is no greater than that delegated to it by Congress, and the APA requires that courts "shall … . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A).

106.    Under the APA, courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an importance aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

107.    USDA's Petition Denial creates an exception to organic production requirements under OFPA without any statutory basis. USDA's Petition Denial and its decision to continue to allow hydroponic operations to be certified organic under OFPA, are *ultra vires* actions "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance of the law" in violation of OFPA and the APA. 5 U.S.C. § 706(2)(A), (C).

108.    USDA's violations of OFPA and the APA in the Petition Denial described in this Cause of Action are causing injuries to Plaintiffs and their members, for which they have no adequate remedy at law.

## SECOND CAUSE OF ACTION
### VIOLATION OF OFPA AND THE APA: PETITION DENIAL IS CONTRARY TO OFPA'S IMPLEMENTING REGULATIONS

109.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 108 of this Complaint as if fully set forth herein.

110.    OFPA's ecologically-integrated organic regulations require producers to manage soil fertility; implement tillage, crop rotation, and cover cropping practices; and to improve natural resources including soil quality. Organic regulations provide that a producer "must" manage soil fertility and "manage plant and animal materials to maintain or improve soil organic matter content." 7 C.F.R. § 205.203.

111.    Hydroponic operations cannot meet these soil management requirements. USDA's decision to exempt hydroponic operations from these mandatory regulatory

requirements is unlawful. The regulations plainly require that an organic producer "must" manage crop nutrients and soil fertility, 7 C.F.R. § 205.203(b); "implement tillage and cultivation practices," *id.* § 205.203(a); "manage plant and animal materials to maintain or improve soil organic content" without contamination, *id.* § 205.203(c); practice crop rotation to "maintain or improve soil organic matter content," *id.* § 205.205, and "use management practices . . . *including* but not limited to crop rotations" to prevent crop pests, weeds, and diseases, *id.* § 205.206. Nowhere do the regulations indicate that these mandatory provisions apply only to soil-based systems.

112.    USDA's Petition Denial violates OFPA's implementing regulations, 7 C.F.R. part 205, and is arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of the APA, 5 U.S.C. §702(2)(A).

113.    USDA's violations of OFPA and the APA in the Petition Denial described in this Cause of Action are causing injuries to Plaintiffs and their members, for which they have no adequate remedy at law.

### THIRD CAUSE OF ACTION
### VIOLATION OF OFPA AND THE APA: PETITION DENIAL IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW

114.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115.    The Petition Denial acknowledges that "all organic operations, including hydroponic operations" must "demonstrate compliance with USDA organic regulations." The Petition Denial fails to explain how hydroponic operations can meet OFPA's soil fertility statutory mandate and its soil management regulations, nor how accredited organic certifiers can ensure that their certification practices comply with OFPA. The Petition Denial also fails to explain how hydroponic operations can adhere to organic regulations requiring that organic producers "must select and implement tillage and cultivation practices that maintain or improve the physical, chemical, and biological condition of soil" on the production site, and that require organic producers "must manage crop nutrients and soil fertility through rotations, cover crops, and the application of plant and animal materials." 7 C.F.R. § 205.203.

116.     The Petition Denial lacks any support for USDA's rationale that OFPA's mandatory soil-based regulations do not apply to soil-less systems, and fails to explain how hydroponics can meet all soil-based requirements of OFPA.

117.     The Petition Denial is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of OFPA and the APA. 5 U.S.C. § 702(2)(A); *Motor Vehicle Mfrs. Assoc.*, 463 U.S. at 43.

118.     USDA's violations of OFPA and the APA in the Petition Denial described in this Cause of Action are causing injuries to Plaintiffs and their members, for which they have no adequate remedy at law.

### FOURTH CAUSE OF ACTION
#### VIOLATION OF OFPA AND THE APA: PETITION DENIAL RESULTS IN INCONSISTENT ORGANIC STANDARDS

119.     Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 118 of this Complaint as if fully set forth herein.

120.     It is the purpose of OFPA "to establish national standards . . . to assure consumers that organically produced products meet a consistent and uniform standard." 7 U.S.C. § 6501(2).

121.     As stated above, OPFA contains statutory and regulatory requirements concerning soil management and soil fertility that must be met in order for a crop production farm to be certified organic, and its products sold to consumers under the organic label. *See* 7 U.S.C. § 6513(b); 7 C.F.R. Part 205. Hydroponic operations cannot meet these soil management requirements because they do not utilize soil nor contribute to soil fertility.

122.     In allowing hydroponic operations to be certified organic without meeting OFPA's statutory and regulatory requirements, USDA's Petition Denial violates OFPA's purpose and design to establish national standards for organic production, and results in inconsistent and uninform organically produced products.

123.     The Petition Denial is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of OFPA and the APA. 5 U.S.C. § 702(2)(A).

124.    USDA's violations of OFPA and the APA in the Petition Denial described in this Cause of Action are causing injuries to Plaintiffs and their members, for which they have no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, the Plaintiffs respectfully request that the Court:

125.    Declare that USDA's Petition Denial, which creates an exception for hydroponic operations from compliance with the mandatory statutory and regulatory requirements of OFPA, is not authorized by OFPA, and violates OFPA and the APA;

126.    Declare that USDA's rationale for allowing organic certification of hydroponic operations in the Petition Denial is arbitrary and capricious, in violation of OFPA and the APA;

127.    Declare that by issuing the Petition Denial and allowing organic certification of hydroponic operations, USDA has created an inconsistent organic standard, in violation of OFPA;

128.    Declare that hydroponic operations do not meet the soil fertility mandates of OFPA;

129.    Direct USDA to comply with OFPA by promulgating regulations and otherwise utilizing its authority under OFPA to prohibit organic certification of hydroponic operations;

130.    Vacate and set aside USDA's Petition Denial, and order that USDA comply with all requirements of OFPA and the APA and issue a new response to the Petition in accordance with the Court's ruling within 90 days;

131.    Issue preliminary and permanent injunctive relief barring USDA from authorizing organic certifications to hydroponic operations;

132.    Award Plaintiffs their fees, costs, expenses, and disbursements, including reasonable attorneys' fees and costs associated with this litigation; and

133.    Grant such further and additional relief as this Court deems necessary, just and proper.

1   Respectfully submitted this 2nd day of March, 2020, in San Francisco, California.

2

3                                              */s/ Sylvia Shih-Yau Wu*
                                        SYLVIA SHIH-YAU WU (CA Bar No. 273549)
4                                        MEREDITH STEVENS (CA Bar No. 328712)
                                        Center for Food Safety
5                                        303 Sacramento Street, 2nd Floor
                                        San Francisco, CA 94111
6                                        Phone: (415) 826-2770
                                        Emails: swu@centerforfoodsafety.org
7                                                    meredith@centerforfoodsafety.org

8

9                                        *Counsel for Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28