UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR FOOD SAFETY, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>SONNY PERDUE, et al.,<br><br>    Defendants. | Case No. 20-cv-01537-RS<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' CROSS MOTION, AND DENYING PLAINTIFFS' MOTION TO COMPLETE THE ADMINISTRATIVE RECORD** |

## I. INTRODUCTION

This case stems from an ongoing debate about whether hydroponics, a form of soil-less agriculture, may be certified organic. In a rulemaking petition, Plaintiff Center for Food Safety ("CFS") asked the United States Department of Agriculture ("USDA") to prohibit the organic certification of hydroponic production systems. USDA declined the request. CFS now seeks review of the USDA's denial letter. As set forth in detail below, Defendants' motion for summary judgment is granted and Plaintiffs' corresponding motion is denied because USDA's denial of the rulemaking petition reasonably concluded the applicable statutory scheme does not exclude hydroponics from the organic program. Plaintiffs' motion to complete the administrative record is also denied.

## II. BACKGROUND

### A. Statutory Background

The Organic Foods Production Act of 1990 ("OFPA"), 7 U.S.C. §§ 6501-6524, established

national certification and production standards for organic produce. Designed to remedy the inconsistencies among varying state organic certification schemes, OFPA authorized the creation of the National Organic Program ("NOP"), which sets the national standards and administers the certification process. 7 U.S.C. § 6503. OFPA additionally created the National Organic Standards Board ("NOSB"), a fifteen-member coalition of farmers, handlers, retailers, conservationists, scientists, certifiers, and consumer advocates "to assist in the development of standards for substances to be used in organic production and to advise the Secretary" on other aspects of implementation. 7 U.S.C. § 6518. USDA "shall consult" with the NOSB in developing the organic program. 7 U.S.C. § 6503(c).

### B. Procedural Background

On January 16, 2019 CFS submitted to USDA a "Petition Seeking Rulemaking Excluding Organic Certification of Hydroponic[1] Agricultural Production Systems and Products" ("Petition"). Administrative Record ("AR") 4. Specifically, CFS asked USDA to (1) issue regulations excluding organic certification of hydroponic agricultural production, (2) amend 7 C.F.R. § 205.105 (titled "Allowed and prohibited substances, methods, and ingredients in organic production and handling") to prohibit hydroponic systems, (3) "[e]nsure that ecologically integrated organic production practices are maintained as a requirement for organic certification as defined by OFPA and its regulations[,]" and (4) revoke all existing organic certifications already issued to hydroponic operations. AR 4-5. About six months later, USDA denied the Petition. CFS filed for review of the denial on March 2, 2020.

### III. MOTION TO COMPLETE OR SUPPLEMENT THE ADMINISTRATIVE RECORD

In reviewing an agency decision, courts apply the appropriate Administrative Procedure Act ("APA") standard of review, 5 U.S.C. § 706, based on the administrative record compiled by the agency and submitted to the court. See *Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th

---

[1] The Petition defines "hydroponics" as "a catch-all for a diverse array of systems which incorporate, to some degree, containers that house plant roots in either a liquid solution or various solid substrates[.]" AR 8.

Cir.1986); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). An agency's designation and certification of the administrative record is treated like other established administrative procedures, and thus entitled to a presumption of regularity. *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir.1993). Accordingly, "[i]n the absence of clear evidence to the contrary, courts presume that [public officers] have properly discharged their official duties." *United States v. Anderson*, 517 U.S. 456, 464 (1996). To meet this burden, a plaintiff must identify the allegedly omitted materials and "non-speculative grounds" to believe that the agency considered the materials in coming to its decision. *Oceana, Inc. v. Pritzker*, 2017 WL 2670733, at *2 (N.D. Cal. June 21, 2017). The presumption can also be rebutted on a showing that the agency applied the wrong standard in compiling the record. *Id.* Plaintiffs need not show bad faith or improper motive. *People of the State of Cal. ex rel Lockyer v. U.S. Dep't of Agric.*, 2006 WL 708914, at *2 (N.D. Cal. Mar. 16, 2006).

CFS seeks introduction of six types of non-privileged documents: (1) excerpts of transcripts from NOSB Board meetings in 2002, 2006, 2008, 2016, and 2017; (2) written comment letters to NOSB and the NOP from 2016 and 2017 on the topic of organic certification of hydroponic operations; (3) emails between the USDA and organic certifiers in which certifiers respond to a 2016 survey regarding certification of hydroponic operations; (4) an Agriculture Marketing Service ("AMS"), a branch of USDA, staff email chain discussing the 2016 certifier survey; (5) a January 2016 email from an organic certifier to the AMS; and (6) slides from a presentation given by the AMS to the NOP on March 23, 2016. The arguments regarding the propriety of including each set of documents are considered in turn.

First, CFS complains USDA excluded every oral comment from the NOSB board meetings regarding the compatibility of hydroponic operations with soil-based regulations. It contends these comments belong in the record both because they stem from deliberations and processes described in the Petition and because the existing record refers to them repeatedly. USDA counters by admitting that while its denial letter purported to rely on "the substantial deliberation and input on hydroponics between 1995 and 2017 from a variety of sources, including the NOSB," it never

claimed to have reviewed *every* public comment. AR 1377. CFS has not provided anything other than narrative, speculative evidence suggesting USDA must have considered these excerpts because it considered other types of public input on this topic. More importantly, CFS focuses on the excerpts' impact on the question of hydroponic certification at large rather than the actual denial of their petition.

Second, CFS argues a variety of anti-hydroponics comment letters were improperly left out. It asserts USDA admitted it considered comment letters, but only included a letter in favor of organic certification of hydroponic systems. In particular, CFS highlights a letter from OFPA's original drafter, Senator Leahy. USDA has conceded that Senator Leahy's letter should have been included in the Administrative Record and has updated it accordingly. As to the other letters, however, USDA takes the same position as against the excerpts – it did not consider every public comment relating to this longstanding controversial issue. CFS has provided no evidence showing USDA considered each, or even many, of the comments individually in coming to the decision to deny CFS's petition.

Third, CFS argues that the survey responses should be included because USDA considered "deliberation and input on [hydroponics] between 1995 and 2017 from a variety of sources, including . . . public stakeholders[.]" AR 1377. The responses CFS seeks to include indicate some certifiers were willing to certify hydroponic operations. These variances, CFS argues, show how certification of hydroponics has resulted in inconsistent standards. That they may be subject to such an interpretation ultimately has no bearing on whether they were indirectly considered by USDA. Again, the contention that USDA must have considered these particular survey responses because it considered twenty-three years of "deliberation and input" from a variety of sources is conclusory. *See* AR 1377.

Last, CFS groups together items (4) through (6) above under the heading "internal communications and draft documents." Motion to Complete or Supplement Administrative Record ("Mot.") at 11. It argues these communications are "essential to this Court's understanding of [CFS's] claims." *Id.* Moreover, it contends the slides were viewed by staff members within USDA

ORDER
CASE NO. 20-cv-01537-RS
4

responsible for administering OFPA, meaning that they were directly considered. The emails, it argues, demonstrate USDA's knowledge of how organic standards were being applied. USDA is again correct that Plaintiffs have not met their burden in showing that the agency considered these materials in handing down the decision at issue, even if some USDA employee has at some point considered the information in the larger debate surrounding the certification of hydroponics.

In the alternative, Plaintiffs urge supplementation of the record with these documents. Courts may look beyond the administrative record in four scenarios: when extra-record evidence is necessary (1) to determine whether the agency has considered all relevant factors and explained its decision; (2) to determine whether the agency has relied on documents not in the record; (3) to explain technical terms or complex subjects; or (4) to make a showing of agency bad faith. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992-93 (9th Cir. 2014).

CFS couches its argument in the first and third scenarios. It contends the materials provide insight into OFPA's legislative history, application of statutes and regulations, and the inconsistent results. It also argues that they aid in explaining complex subjects. Though the subject matter of this action is undoubtedly complicated, the question at issue in this motion is not one of scientific complexity. Even if it were, these documents do not seek to clarify the mechanics of hydroponic production. Furthermore, though CFS may be correct that USDA cherry-picked its records, as in the case of the pro-hydroponics letter, it makes no argument that the excluded records are necessary to USDA's ultimate determination. While including the materials may result in a fuller record, CFS are not seriously contending in their actual motion for summary judgment that the agency did not consider all the relevant documents or factors. Because CFS can neither overcome the burden on completion nor show that supplementation is warranted, the motion is denied.

### IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

**A. Legal Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or

defenses." *Celotex v. Catrett,* 477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (internal citations and quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which it bears the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

To preclude the entry of summary judgment, the non-moving party must bring forth material facts, i.e., "facts that might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586 (1986). The trial court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991).

**B. Discussion**

CFS brings this action under § 706 of the APA, which requires courts to hold unlawful agency actions found to be arbitrary, capricious, an abuse of discretion, in excess of statutory jurisdiction, or otherwise contrary to law. 5 U.S.C. § 706(2). An agency violates this standard when it fails to "articulate[] a rational connection between the facts found and the choice made." *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2011). It may not "rel[y] on factors which Congress has not intended it consider, entirely fail[] to consider an important aspect of the problem," or "offer[] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 103 S. Ct. 2856, 2867 (1983). Consequently, courts

may consider neither "reasons for agency action which were not before the agency," *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994), nor "*post hoc* rationalizations." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (internal citation omitted).

### 1. Standard of Review

The parties disagree both about what ought to be reviewed and under what standard. CFS urges review of whether USDA's petition denial was reasonable under OFPA. USDA argues that the appropriate inquiry is whether its denial letter reasonably interpreted the Petition. Because USDA's interpretation is legal rather than scientific or technical, the parties are essentially aligned – an evaluation of the reasonableness of USDA's denial requires interpretation of the statute. The standard of review is, therefore, the threshold, and likely determinative, issue.[2]

USDA emphasizes judicial review of a refusal to promulgate a rule is "extremely limited and highly deferential." *Massachusetts v. E.P.A*, 549 U.S. 497, 528-29 (2007) (internal citations omitted). CFS answers with the Ninth Circuit's reminder: "In denying a petition for rulemaking, an agency must, at a minimum, clearly indicate that it has considered the potential problem identified in the petition and provide a reasonable explanation as to why it cannot or will not exercise its discretion to initiate rulemaking." *Compassion Over Killing v. U.S. F.D.A.*, 849 F.3d 849, 857 (9th Cir. 2017). In the same case, USDA points out, the Ninth Circuit endorsed a D.C. Circuit rule – "an agency's refusal to institute rulemaking proceedings is at the high end of the range of levels of deference we give to agency action under our arbitrary and capricious review." *Id.* at 854 (internal citation and quotation marks omitted). Nonetheless, the parties appear to agree that *Massachusetts v. EPA* provides the relevant standard, though they disagree about the effect of its application to the USDA's petition denial.

In *Massachusetts*, the Supreme Court rejected the Environmental Protection Agency's ("EPA") argument that the Clean Air Act, which provides that the EPA "*shall* by regulation prescribe . . . standards applicable to the emission of any air pollutant . . . which in [the

---

[2] The parties agree USDA's denial letter is final agency action subject to judicial review.

Administrator's] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare," permitted the agency to refuse to regulate pollutants, even if they were deemed hazardous. *See Massachusetts*, 549 U.S. at 528 (emphasis added). Instead, the Court concluded that while the EPA was entitled to exercise judgment in determining which pollutants may cause or contribute to air pollution, it was required by the text of the Clean Air Act to regulate any pollutants designated as dangerous. *Massachusetts*, 549 U.S. at 533.

CFS relies on *Massachusetts* for the proposition that this agency action is reviewable. It does not dispute that, as in most administrative law cases, agencies are entitled to deference. Rather, it posits *Massachusetts* is both the relevant and preferable standard because it requires agencies to provide reasonable explanations which conform to, and are grounded in, the statute. It concedes that some level of deference, be it *Chevron*[3] or the lesser *Skidmore*[4] standard, applies to judicial review of the statute if it is determined to be ambiguous. USDA seems to agree to the extent it relies on *Compassion Over Killing*, that it must provide some baseline, "reasonable explanation as to why it cannot or will not exercise its discretion to initiate rulemaking." 849 F.3d at 857. Because USDA's decision to deny the Petition was based on its legal interpretation of the statute, rather than its technical, agricultural expertise or resource allotment, *Massachusetts* is instructive.

Nonetheless, it remains unclear exactly how to reconcile these many applicable, overlapping standards. It is undisputed that the arbitrary and capricious standard of § 706 roots the inquiry, but in the course of acknowledging that "some debate remain[ed] . . as to the rigor with which [courts] review an agency's denial of a petition for rulemaking," the Supreme Court decided *Massachusetts* and clarified that such refusals are entitled to "extremely limited and highly deferential" review. 549 U.S. at 527-28 (internal citation and quotation marks omitted). Its

---

[3] *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984).

[4] *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

requirement that an agency provide some "reasonable explanation as to why it *cannot* or will not exercise its discretion," therefore, stems from the original § 706 assessment. *Id.* at 534 (emphasis added). Seemingly the only way to determine if an agency's reading of the statute constitutes a "reasonable explanation," is to look to the plain text and, if that provides no clear answer, to turn to the agency's reading with extreme deference. Thus, when a court is tasked with reviewing an agency's legal, rather than technical, interpretation of a statute, the evaluation of the proffered "reasonable explanation" blooms into a deferential, *Chevron*-esque analysis. To the extent USDA's denial reasonably interpreted and responded to the Petition in a way that accords with OFPA, it may be not be disturbed.

### 2. *Analysis*

In its denial letter, USDA gave three reasons for denying CFS's request to initiate a rulemaking and amend 7 U.S.C. § 6508 specially to prohibit hydroponics. First, it reiterated its consistent approval of the certification of hydroponic operations meeting the existing requirements for organic crop production. On that basis, it refused here to adopt an inconsistent standard. Second, it refused to give effect to the NOSB's April 2010 recommendation to prohibit organic classification for hydroponics because the recommendation "did not provide sufficient details to support moving forward with guidance or rulemaking" and conflicted with 1995 NOSB recommendations on the same question. AR 1376. Third, NOP disagreed that the various OFPA provisions mentioning or imposing soil requirements "require that all organic production occur in a soil-based environment." AR 1377. Only production systems using soil must adhere to such requirements. Moreover, USDA believes that hydroponic systems may be capable of the resource cycling and improvement of ecological balance OFPA requires and thus need not be categorically prohibited.

To be sold under the organic label, products (1) shall be "produced and handled without the use of synthetic chemicals[;]" (2) shall "not be produced on land to which any prohibited substances, including synthetic chemicals, have been applied during the 3 years immediately preceding the harvest of agricultural products;" and (3) shall "be produced and handled in

compliance with an organic plan agreed to by the producer and handler of such product and the certifying agent." 7 U.S.C. § 6504.

Section 6513 provides structure to the organic plan requirement. Subsection (a) directs a producer or handler to submit an organic plan to a certifying agent and, if applicable, the State organic certification program. A certifying agent then will "determine if such plan meets the requirements of the programs." 7 U.S.C. § 6513(a). Subsections (b) through (d) and subsection (f) list types of organic plans. Subsection (b) is entitled "Crop production farm plan." Subsection (c) is entitled "Livestock plan;" (d) is "Mixed crop livestock production;" (f) pertains to "Management of wild crops." Subsections (e) and (g) do not refer to specific types of organic plans. They are entitled "Handling plan" and "Limitation on content of plan," respectively. Subsection (g) reads: "An organic plan shall not include any production or handling practices that are inconsistent with this chapter."

Under subsection (b), "Crop production farm plan," subsection (1) is entitled "Soil fertility" and provides: "An organic plan shall contain provisions designed to foster soil fertility, primarily through the management of the organic content of the soil through proper tillage, crop rotation, and manuring." Subsection (2) to subsection (b) pertains to manuring. It requires an organic plan to "contain terms and conditions that regulate the application of manure to crops[,]" and further restricts the application of raw manure.

In addition to imposing requirements, OFPA clearly delineates unacceptable, inorganic methods in 7 U.S.C. § 6508, titled "Prohibited crop production practices and materials." First, subsection (a), titled "Seed, seedlings and planting practices," disallows farms from applying materials or engaging in practices on seeds or seedlings that are contrary to the applicable organic certification program. Next, subsection (b) prohibits the application of synthetic or commercially blended fertilizers containing prohibited substances to soil. Producers also may not use phosphorus, lime, potash or any other material inconsistent with the applicable organic certification program as a source of nitrogen in soil. Subsection (c) prohibits the use of natural poisons, plastic mulches or "transplants" treated with synthetic materials in crop management.

1    While § 6508 lists prohibited practices and materials, 7 U.S.C. § 6512 embraces any "production
2    or handling practice . . . not prohibited or otherwise restricted under this chapter," unless it would
3    be inconsistent with the organic program.
4           USDA promulgated regulations to effectuate OFPA's objectives and define its scope.
5    "Organic production" is defined as "[a] production system that is managed in accordance with the
6    Act and regulations in this part to respond to site-specific conditions by integrating cultural,
7    biological, and mechanical practices that foster cycling of resources, promote ecological balance,
8    and conserve biodiversity." 7 C.F.R. § 205.2. Any "producer or handler of a production or
9    handling operation" who intends to seek organic certification "must comply with the applicable
10   provisions" laid out in Subpart C, a section of regulations titled "Organic Production and Handling
11   Requirements." 7 C.F.R. § 205.200. Section 205.200 further requires "[p]roduction practices
12   implemented in accordance with this subpart must maintain or improve the natural resources of the
13   operation, including soil and water quality."
14          CFS focuses on the ways OFPA accentuates, by its terms and structure, the centrality of
15   soil to the organic label. Those engaged in crop production "shall," by the terms of 7 U.S.C. §
16   6513(b)(1), provide to certifiers an organic plan "contain[ing] provisions designed to foster soil
17   fertility." It follows, CFS argues, that any crop production system that cannot promote soil
18   fertility, by virtue of having no soil to manage, cannot be certified as in compliance with an
19   organic plan, as required by 7 U.S.C. § 6504. Other OFPA provisions contain the word "may,"
20   which is permissive, rather than "shall," which is mandatory. *See, e.g.,* 7 U.S.C. § 6507(a) ("The
21   governing State official may prepare and submit a plan . . .). The inclusion of "may" in other
22   provisions supports the argument that Congress intended the management of soil fertility to be
23   obligatory. Because "*shall* usually connotes a requirement," CFS contends that USDA's
24   interpretation, as set forth both in its denial letter and by regulation in 7 C.F.R. § 205.200, of the
25   soil fertility requirements as applying only to soil-based operations is contrary to the plain
26   meaning of 7 U.S.C. § 6513(b)(1). *See Kingdomware Techs., Inc. v. United States*, 136 S. Ct.
27   1969, 1977 (2016) (emphasis added) (internal quotation marks omitted). That section 6512

permits any "production or handling practice" not prohibited does not belie this reading, CFS argues. Such a practice must not be "inconsistent with the applicable organic certification program." 7 U.S.C. § 6512. Lastly, CFS maintains that §§ 6505, 6506, and 6517 articulate the narrow circumstances in which products or practices may be exempted from OFPA compliance. Under the canon of statutory interpretation *expressio unius est exclusio alterius* (the expression of one thing implies the exclusion of another), the failure to mention any exemptions from the organic crop production plans demonstrates Congressional intent to preclude such exemptions. Read together, these features of OFPA compel a categorial ban of hydroponic systems.

At the outset, USDA responds that Congress failed to "directly [speak] to the precise question at issue:" Does OFPA compel the prohibition of hydroponic systems?, so "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *City of Arlington v. F.C.C.*, 569 U.S. 290, 296 (2013) (citing *Chevron,* 467 U.S. at 842-43). Though the Petition asserted that OFPA compels the categorical bar of hydroponic systems, neither hydroponic systems nor methods are directly or indirectly mentioned or considered. OFPA therefore does not speak directly to the issue and cannot compel any action related to hydroponics. Under that rubric, USDA's interpretation, as set forth in its regulations at 7 C.F.R. § 205.200, that soil fertility provisions apply only to production systems using soil is necessarily a permissible reading.

USDA alternatively contends that traditional tools of statutory interpretation suggest that Congress did not intend to prohibit the certification of soil-less agricultural systems. In its view, § 6513 provides a non-exhaustive list of what must be included in some of the most common organic plans, organized on a site-specific basis. It observes that while some subsections of § 6513 reiterate their titles and thereby confine the application of those requirements to the relevant types of production systems, subsection (b), which pertains to crop production, does not. *See, e.g.*, 7 U.S.C. § 6513(c) (bearing the title "Livestock plan," and providing "An organic livestock plan shall contain. . ."); 7 U.S.C. § 6513(f) (bearing the title "Management of wild crops," and explaining "[a]n organic plan for the harvesting of wild crops shall . . ."). Applying subsection

(b)'s soil fertility requirements to all organic plans, however, would be nonsensical – it would require handling operations, at subsection (e), which only receive and process agricultural goods, to be soil-based. Because handlers rarely deal with soil, application of subsection (b)(1) to handlers might exclude all handlers from certification, meaning that organic agricultural products could never be distributed to consumers. This strained result, argues USDA, requires a finding that § 6513(b)(1) is, at the very least, ambiguous.

USDA accuses CFS of mischaracterizing the structure and import of § 6513. In the absence of any language indicating resistance to soil-less systems generally, Congress cannot be assumed to "alter the fundamental details of a regulatory scheme in . . . ancillary provisions." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). One soil fertility provision nestled in one paragraph of one subsection cannot alter the character of the entire statute. USDA also points out that, according to CFS's reading, the second paragraph of subsection (b) would *require* all crop production operations to "regulate the manure of application to crops." Because subsection (f) contemplates the certification of wild crop harvesting, which definitionally excludes crops from sites which have been cultivated with fertilizer, subsection (b) cannot be read as mandating the manuring of all crop production systems. *See* 7 C.F.R. § 205.2.  For these reasons, USDA insists that the requirements of § 6513 apply on a site-specific basis.

Lastly, USDA makes a structural argument. Under § 6512, "[i]f a production or handling practice is not prohibited or otherwise restricted under [OFPA], such practice shall be permitted unless it is determined that such practice would be inconsistent with the applicable organic certification program." USDA reads this provision as a Congressional directive to permit and regulate a broad range of production practices. This reading is endorsed by the fact that hydroponic systems are nowhere explicitly prohibited. Hydroponic systems are not among the "[p]rohibited crop production practices and materials" listed in 7 U.S.C. § 6508. According to the same canon invoked by CFS, *expressio unius est exclusio alterius*, the absence of hydroponics from the § 6508 list suggests permission.

The petition denial should not be disturbed because USDA reasonably defends its

determination that OFPA does not compel the prohibition of hydroponics. Though its more granular readings of § 6513 are strained at times, USDA's structural arguments are sound. Sections 6508 and 6512 must be read congruently. An escape-hatch provision reassuring certifiers that any practice not prohibited "shall be permitted," can reasonably be interpreted to firm up the boundaries of § 6508 and make it an exhaustive list. Though CFS's reading has some logical appeal, USDA has, at the very least, offered an equally persuasive interpretation of OFPA's structure as it relates to hydroponics. Because this review is "extremely limited" and "highly deferential" to the agency's reading of the statute it is tasked with administrating, the petition denial will not be disturbed.

CFS unsuccessfully attempts to broaden the scope of the inquiry by alleging USDA understood CFS was seeking guidance on whether and how to certify hydroponics rather than a flat-out ban. It gestures to the June 3, 2019 letter to certifiers emphasizing that all systems, traditional or otherwise, must comply with applicable regulations as evidencing an awareness of the pursuit of clarification rather than simple prohibition. Yet, no indication can be found in the Petition that CFS sought standards for applying the OFPA to hydroponics. It repeatedly emphasizes that hydroponic methods are inconsistent with the text, history, and structure of the statute. Nowhere does it concede the point that hydroponic operations may be certifiable, an antecedent requirement for pursuing implementing guidance. Moreover, USDA persuasively argues CFS lacks standing to pursue specific direction on the implementation of hydroponic certification because it does not seek to have such guidance applied to itself or its members.

USDA's ongoing certification of hydroponic systems that comply with all applicable regulations is firmly planted in OFPA. It therefore provides the "reasonable explanation" required on review, so its denial will not be vacated.

## V. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted. Plaintiffs' motions are denied.

**IT IS SO ORDERED**.

Dated: March 18, 2021

_____
RICHARD SEEBORG
Chief United States District Judge

ORDER
CASE NO. 20-cv-01537-RS
15